**Patricia E. BUHRING, Appellant–Plaintiff,**

v.

**Phillip V. TAVOLETTI, Appellee–Defendant.**

No. 45A03–0810–CV–511.

Court of Appeals of Indiana.

May 12, 2009.

---

Andrew A. Crosmer, William G. Murphey, Rubino Ruman Crosmer Smith Sersic & Polen, Dyer, IN, Attorneys for Appellant.

## OPINION

BROWN, Judge.

Patricia E. Buhring appeals a judgment in her action against Phillip V. Tavoletti. Buhring raises two issues, which we consolidate and restate as whether the trial court erred when it instructed the jury regarding mitigation and damages. We reverse and remand.

On November 26, 2005, the vehicle that Tavoletti was driving struck the rear of Buhring's vehicle. Buhring was examined by paramedics at the scene of the accident, but she did not go to the hospital. After the accident, Buhring had "the beginning" of a headache and a "lump on the bottom of [her] skull." Transcript at 55. In the days following the accident, Buhring had headaches "off and on" and had increasing neck pain. Id. at 60. She treated her symptoms with Motrin, but the neck pain continued to increase. After Christmas, Buhring scheduled an appointment with her physician, Dr. Alan Jones.

Buhring first saw Dr. Jones's partner, and she complained of problems with headaches, neck pain, and her balance following the accident. Dr. Jones's partner ordered cervical x-rays and diagnosed Buhring with "reversal of the normal cervical lordosis, indicative of muscle spasm" and "a spur formation at C4–5 and 6, indicative of osteoarthritis." Id. at 203. Buhring was prescribed physical therapy, non-steroidal anti-inflammatory medications, and exercises. Buhring saw Dr. Jones a couple of weeks later still complaining of neck pain and stiffness. Dr. Jones prescribed ultrasound and electrical stimulation, osteopathic manipulation, anti-inflammatory medications, and exercises. The next week, Dr. Jones also recommended that Buhring use "cervical traction at home," but Buhring declined to do so. Id. at 204.

Over the next few weeks, Buhring continued to complain of neck pain, and Dr. Jones scheduled Buhring for an MRI of her cervical spine. The February 2006 MRI revealed "degenerative disc disease . . . at the levels of C4–5, C5–6, C6–7" and "circumferential disc herniation . . . at the levels of C4–5, C5–6, C6–7." Id. at 206. Additionally, the MRI revealed "straightening of the cervical spine, indicative of muscle spasm in the neck." Id. at 207. Dr. Jones opined that Buhring's herniated discs were common with whiplash injuries. By the end of March 2006, Buhring told Dr. Jones that "she wasn't progressing one way or another and had become frustrated. . . ." Id. at 213.

Buhring next saw Dr. Jones in August 2006, complaining of neck pain, decreased range of motion, light headedness, stomach pain, and tingling in her arms and hands. Dr. Jones prescribed physical therapy and medications. In September 2006, Dr. Jones referred Buhring to a pain management specialist for an epidural steroid injection, but Buhring was unable to obtain

approval for the injection. Dr. Jones noted that the injections cost between $5,000 and $8,000 per treatment and that three injections are typically given.

Dr. Jones saw Buhring again in February 2007, and she had the same neck pain complaints. Dr. Jones saw Buhring again in May, July, and August of 2007, and she was still having problems with her neck. Buhring then saw Dr. Jones regarding her neck in January, February, March, and April of 2008.

Dr. Jones diagnosed Buhring with "a herniated cervical disc" and "cervical whiplash injury." *Id.* at 226. Dr. Jones opined that Buhring's injuries could escalate to the development of weakness in her arms and constant pain or radicular pain. At that point, Buhring would require surgery, which would cost $50,000 to $100,000. Dr. Jones also believed that Buhring's injuries were "permanent." *Id.* at 227.

Buhring filed a complaint against Tavoletti for negligence. At the jury trial, Tavoletti admitted that he was negligent but argued that Buhring "was not injured to the extent claimed, . . . that all or part of her treatment was not a proximate result of the accident[,] and that the treatment she did receive was not reasonable and necessary." *Id.* at 8.

The trial court instructed the jury in part regarding damages as follows:

Any damages awarded must be reasonable. In awarding a verdict to the Plaintiff you may award her only such damages as reasonable to fairly and adequately compensate her for her injuries and damages that you find from a preponderance of the evidence in this case that she has sustained as a direct and proximate result from the accident in question.

Damages are designed to compensate an injured person for any damages sustained by her as a direct and proximate result of the negligence of another, and to place an injured person in the same financial position in which she would have been had the negligence not occurred.

Appellant's Appendix at 131. Buhring objected to the portion of the damages instruction that stated: "Damages are designed to . . . place an injured person in the same financial position in which she would have been had the negligence not occurred." *Id.* at 131. The trial court gave the instruction over Buhring's objection.

Further, the trial court instructed the jury as follows regarding mitigation of damages:

The Plaintiff must use reasonable care to minimize her damages. This is called mitigation of damages. If you find the Defendant is liable and the Plaintiff has suffered damages, Plaintiff may not recover for any item of damage which she could have avoided through the use of reasonable care.

The Defendant has the burden of proving by a preponderance of the evidence that the Plaintiff failed to use reasonable care to minimize her damages.

*Id.* at 131–132. Buhring objected to instructing the jury regarding mitigation of damages. Buhring argued that there had been "no evidence entered to indicate that Ms. Buhring in any way failed to mitigate her damages." Transcript at 318. Tavoletti argued that Buhring failed to get treatment recommended by Dr. Jones and that Buhring's delay in getting treatment could have prolonged the injury or prevented healing. The trial court found that enough evidence had been presented to give the mitigation of damages instruction.

The jury returned a verdict for Buhring in the amount of $12,500.00. Buhring filed

a motion to correct error, arguing that the trial court erred in instructing the jury, but the trial court denied the motion.

██ We first note that Tavoletti has failed to file an appellee's brief.[1] When the appellee fails to submit a brief, we need not undertake the appellee's burden of responding to arguments that are advanced for reversal by the appellant. *Hamiter v. Torrence,* 717 N.E.2d 1249, 1252 (Ind.Ct.App.1999). Rather, we may reverse the trial court if the appellant makes a prima facie case of error. *Id.* "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." *Id.*

██ The issue on appeal is whether the trial court erred when it instructed the jury regarding mitigation and damages. The giving of jury instructions lies within the trial court's sound discretion, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion. *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 944 (Ind.2001). The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Centennial Mortgage, Inc. v. Blumenfeld,* 745 N.E.2d 268, 278 (Ind.Ct.App.2001). In determining whether it is error to refuse a tendered instruction, we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record supporting the instruction; and (3) whether the substance of the instruction is covered by other instructions. *Elmer Buchta Trucking,* 744 N.E.2d at 944.

A. *Mitigation of Damages Instruction.*

██ Buhring argues that there was no evidence in the record to support giving the trial court's mitigation of damages instruction. "[T]he principle of mitigation of damages addresses conduct by an injured party that aggravates or increases the party's injuries." *Willis v. Westerfield,* 839 N.E.2d 1179, 1187 (Ind.2006). Mitigation of damages is not an affirmative defense to liability; rather, failure to mitigate damages is an affirmative defense that may reduce the amount of damages a plaintiff is entitled to recover after liability has been found. *Id.* "Put simply, a plaintiff in a negligence action has a duty to mitigate his or her post-injury damages, and the amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented." *Id.* "The defendant bears the burden to prove that the plaintiff has not used reasonable diligence to mitigate damages." *Id.* "The defendant's burden includes proof of causation, that is, the defendant must prove that the plaintiff's unreasonable post-injury conduct has increased the plaintiff's harm, and if so, by how much." *Id.*

The affirmative defense of failure to mitigate damages has two elements, and as to both the defendant bears the burden of proof by a preponderance of the evidence. First, the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages. Second, the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct. In this respect, the defendant bears the same burden with respect to this defense that the plaintiff bears with respect to the claim for damages. It is not enough to

---

**1.** Several days after the appellee's brief was due in this case, Tavoletti filed a motion to file a belated reply brief, which the motions panel of this court denied.

establish that the plaintiff acted unreasonably. The defendant must establish resulting identifiable quantifiable additional injury, just as the plaintiff must prove harm resulting from the defendant's acts.

*Id.* at 1188. "When, as here, a defendant claims that after an accident a plaintiff unreasonably failed to follow medical advice, in order to establish a failure to mitigate, the defendant must also prove that the plaintiff's actions caused the plaintiff to suffer a discrete, identifiable harm arising from that failure, and not arising from the defendant's acts alone." *Id.*

 In *Willis*, the Indiana Supreme Court held that expert testimony will often, but not always, be required to establish that the plaintiff's conduct caused any additional harm, and if so, how much. *Id.* Expert testimony is "required where the question involves medical factors beyond the common knowledge of the layman such that the jury could only indulge in speculation in making a finding based thereon." *Id.* "However, on medical matters which are within the common experience, observation, or knowledge of laymen, no expert testimony is required to permit a conclusion on causation." *Id.* Ultimately, the Court held that "whether a failure to mitigate defense based on a plaintiff's failure to follow medical treatment advice requires expert medical testimony to establish causation must be resolved on a case-by-case basis." *Id.* at 1189. Further, "[a] party presenting a failure to mitigate damages defense without expert testimony on causation will do so at his or her own peril." *Id.*

 When determining whether the evidence warrants a mitigation of damages instruction, the trial court must determine whether the defendant produced enough evidence of causation to support the giving of the instruction. *Id.* "In mak-

ing this determination, the trial court should consider the nature of the medical question presented and in particular whether the matter is within the common experience, observation, or knowledge of laymen." *Id.* (citing *Johnson v. Bender,* 174 Ind.App. 638, 644, 369 N.E.2d 936, 940 (1977)). "If it is, and the defendant has produced competent non-expert evidence of causation, the defendant's failure to present expert opinion testimony on causation does not preclude an instruction on failure to mitigate." *Id.* "On the other hand, if the trial court finds that the medical question presented does require expert opinion testimony on causation, a defendant who has failed to point to such testimony at trial will not be entitled to a failure to mitigate damages instruction." *Id.* "This evidence may be elicited by cross-examination of the plaintiff's expert or by offering expert testimony for the defense." *Id.*

In *Willis,* the defendant argued that the plaintiff failed to mitigate her damages when she disregarded her doctor's treatment advice regarding physical therapy sessions. *Id.* The defendant did not produce his own expert medical evidence, instead relying upon his cross examination of the plaintiff's doctor. *Id.* at 1189–1190. Specifically, the doctor testified on direct examination as follows:

> Q: Has Ann Willis done anything unreasonable following her May 9, 1996, motor vehicle collision to aggravate or worsen her accident-related injuries in any way, in your opinion?
>
> A: No she has not.

*Id.* at 1189. On cross examination, the doctor testified regarding the plaintiff's failure to attend physical therapy sessions as follows:

> Q: And so if they don't follow your recommendation to go to physical thera-

py when prescribed, they're not helping themselves, correct?

A: In that particular condition she didn't help herself.

*Id.* at 1189–1190. The Indiana Supreme Court concluded that the defendant "failed to carry his burden to show how [the plaintiff's] alleged failure to follow [her doctor's] recommendation that she seek physical therapy increased her harm, and if so, by any quantifiable amount or specific item." *Id.* at 1190.

■■ In arguing for the giving of the mitigation of damages instruction, Tavoletti argued that Buhring failed to get treatment recommended by Dr. Jones and that Buhring's delay in getting treatment could have prolonged the injury or prevented healing. We will first address Buhring's delay in getting treatment. The collision happened on November 26, 2005. At that time, Buhring started having headaches and slight neck pain. However, the neck pain progressively increased and over-the-counter medications did not help. After Christmas, Buhring scheduled an appointment with Dr. Jones. On cross examination, Tavoletti asked Dr. Jones:

Q And a patient's delay in obtaining treatment during an acute phase of a whiplash-type injury could prolong the symptoms as compared to if they had gotten immediate treatment; correct?

A Depends when her symptoms started. Sometimes after an injury like this, there's a weakness, there's an injury that doesn't get manifested for a week or two later. I mean, I've had auto accident cases where they've been injured and, you know, and they feel fine for a day or two or a week, and then all of a sudden they start having lots of symptoms.

Transcript at 252. Dr. Jones later stated: "Again, everybody is not cookbook, straightforward, the way you're [Tavolet-ti's counsel] presenting it. Some people it takes a period of time that it allows over weeks, months. It's not always an acute process where you suddenly see it." *Id.* at 255. Dr. Jones's cross examination testimony does not establish that Buhring should have received earlier treatment. Further, Tavoletti failed to demonstrate that Buhring's actions caused her to suffer a discrete, identifiable harm arising from her failure to receive earlier treatment, and not arising from Tavoletti's acts alone.

As for Buhring's failure to receive treatment recommended by Dr. Jones, Tavoletti raised one instance of failure to receive treatment during his closing statement at the trial. Dr. Jones testified that he recommended a cervical traction device for Buhring, but Buhring testified that she refused to use it. Although Tavoletti presented evidence that Buhring had refused medical treatment recommended by Dr. Jones, Tavoletti presented no evidence that the failure to use the cervical traction device caused Buhring "to suffer a discrete, identifiable harm arising from that failure." *Willis*, 839 N.E.2d at 1188. Under these circumstances, we conclude that Tavoletti failed to produce enough evidence of causation to support the giving of the mitigation of damages instruction. *See, e.g., id.*

## B. *Damages Instruction.*

■■ Buhring also argues that the following emphasized portion of the damages instruction was an incorrect statement of the law: "Damages are designed to compensate an injured person for any damages sustained by her as a direct and proximate result of the negligence of another, and *to place an injured person in the same financial position in which she would have been had the negligence not*

*occurred."* [2] Appellant's Appendix at 131 (emphasis added). Buhring argues that "[p]lacing an injured party in the same 'financial position' is the measure of damages when considering a breach of contract claim," not a negligence claim. Appellant's Brief at 21.

 In general, "[a] person injured by the negligence of another is entitled to reasonable compensation." *Berman v. Cannon,* 878 N.E.2d 836, 841 (Ind.Ct.App. 2007), *trans. denied.* "Reasonable compensation" refers to an amount that would reasonably compensate the plaintiff for bodily injury and for pain and suffering. *Id.* "It also takes into account past, present, and future expenses reasonably necessary to the plaintiff's treatment and all financial losses suffered, or to be suffered, as a result of the inability to engage in his or her usual occupation." [3] *Id.* Consequently, the instruction's limitation of damages to those damages necessary "to place an injured person in the same financial position in which she would have been had the negligence not occurred" is misleading. The "same financial position" language does not take into account the plaintiff's pain and suffering.

We acknowledge a line of cases following *Remington Freight Lines, Inc. v. Larkey,* 644 N.E.2d 931, 941 (Ind.Ct.App.1994), which held in the context of a retaliatory discharge claim: "The traditional damage measures in tort causes of action are designed to compensate the injured person for the damage sustained by him due to the tort-feasor's actions, and to place the plaintiff in the same financial position in which he would have been had the tort not occurred." (citing 22 Am.Jur.2d, *Damages* § 26 (1988) (*see now* 22 Am.Jur.2d, *Damages* § 27)). However, this concept has been criticized and is subject to substantial limitations:

Compensation is the stated goal of courts in awarding damages for legally recognized losses. The purpose of an award is to make the aggrieved party whole to the extent that it is possible to measure his or her injury in terms of money.

> **Observation:** Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. Compensatory damages, as opposed to criminal sanctions, are not a form of punishment.

With torts, compensation most often takes the form of putting the plaintiff in the same financial position he was in prior to the tort, or that he would have been in if the wrong had not been committed or the injury had not occurred. With contracts, compensation is most often stated in terms of placing the plaintiff in the same financial position in which he would have been had the promise not been broken.

> **Observation:** Such statements as these are overgeneralizations. They ignore nominal damages and cases in which exemplary damages are awarded. Also, they ignore restitutionary recovery, in which the goal of recov-

---

**2.** Although the trial court indicated that the instruction was a pattern instruction, our research does not reveal this language in the Indiana Pattern Jury Instruction for damages in such personal injury actions. *See* Ind. Pattern Jury Instructions—Civil, Chapter 11.

**3.** On the other hand, "[i]n a breach of contract case, the measure of damages is the loss actually suffered by the breach," but "the non-breaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 507 (Ind.Ct.App. 2007).

ery is not compensating the plaintiff, but taking from the defendant the benefit he received. *Such broad statements are also inaccurate in a more fundamental sense.* When a court awards damages in a contract action measured by the value of gains prevented, it may or may not be placing the plaintiff in the same financial position in which he would have been had there been no breach. Other events might have prevented the gains for which the plaintiff is suing.

*When a court awards damages for lost future income in a tort action, the same objection can be made; the plaintiff might have died or lost his job from other causes and never have received the income for which he is being compensated. The inaccuracy of the broad statements of the compensation goal is highlighted even more when damages are awarded for pain and suffering, since the dollars are not awarded as an equivalent of the pain and suffering.*

22 AM.JUR.2D, *Damages* § 27 (footnotes omitted) (emphasis added). We agree with Buhring that the damages instruction given is, at best, misleading and, at worst, an incorrect statement of the law.

*C. Conclusion.*

 Given our conclusions that the evidence did not support giving the mitigation of damages instruction and that the damages instruction was at best, misleading and, at worst, an incorrect statement of the law, we conclude that reversal and a new trial are necessary. In *Simmons v. Erie Ins. Exchange*, 891 N.E.2d 1059, 1070–1073 (Ind.Ct.App.2008), we noted that the Indiana Supreme Court has used two different standards in determining whether an erroneous instruction results in harmless error. The Indiana Supreme Court held in *Elmer Buchta Trucking* that

"one seeking a new trial on the basis of an improper jury instruction must show 'a reasonable probability that substantial rights of the complaining party have been adversely affected.'" 891 N.E.2d at 1071 (quoting *Elmer Buchta Trucking*, 744 N.E.2d at 944). However, the Court has also held that "[a]n erroneous instruction merits reversal if it could have formed the basis for the jury's verdict." *Id.* (quoting *Fleetwood Enters., Inc. v. Progressive N. Ins. Co.*, 749 N.E.2d 492, 495 (Ind.2001)). As in *Simmons*, "we need not resolve the conflict as to the proper standard under which we analyze whether an improper instruction necessitates reversal, as we conclude that the giving of the instruction in this case is prejudicial and requires reversal under any of the standards identified above." *Id.* at 1072.

As in *Simmons*, the matters discussed in the instructions at issue were emphasized to the jury, and the likelihood that the matters were discussed and impacted the jury's verdict is significant. *See id.* at 1073. Consequently, we conclude that the giving of the instructions at issue were not harmless error, and we must remand for a new trial on damages. *See, e.g., id.* (holding that the giving of the mitigation of damages instruction was erroneous and was not harmless error).

For the foregoing reasons, we reverse the judgment and remand for a new trial on damages.

Reversed and remanded.

CRONE, J. and BRADFORD, J., concur.