ATTORNEYS FOR PETITIONER:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
**ZACHARY D. PRICE**
ATTORNEY AT LAW
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**BRENT A. AUBERRY**
**DAVID A. SUESS**
**ABRAHAM M. BENSON**
**BRIGHAM E. MICHAUD**
FAEGRE DRINKER BIDDLE & REATH
LLP
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| MADISON COUNTY ASSESSOR, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 24T-TA-00009 |
| | ) |
| KOHL'S INDIANA, LP, | ) |
| | ) |
| Respondent. | ) |

FILED
Nov 17 2025, 2:06 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**November 17, 2025**

MCADAM, J.

This case is about the evidence required to satisfy the burden of proof in property tax valuation appeals. The parties in this case each presented an expert appraisal valuing the taxpayer's property. The Indiana Board of Tax Review systematically evaluated each appraisal and found both to be extensively flawed. Despite these concerns, it determined that both appraisals satisfied the burden of proof because each

was prepared by an expert in accordance with generally accepted appraisal principles and the Uniform Standards of Professional Appraisal Practice ("USPAP"). Finding the burden met, the Board simply compared the parties' two appraisals and decided that the taxpayer's was more convincing because its flaws were "somewhat less egregious" than those in the Assessor's. On appeal, the Assessor argues that the Board erred by according the appraisals persuasive status based solely on their pedigree as expert appraisals. He contends that the Board's decision to reduce the assessment to the taxpayer's appraisal does not follow from its own findings regarding the fundamental flaws in that appraisal. The Court holds that the Board misapplied the law by applying a *per-se*-burden-of-proof standard that elevated the form of the appraisals over their substantive analysis and reverses the Board's decision on that basis.

## RELEVANT FACTS AND PROCEDURAL HISTORY

Kohl's Indiana, LP owns and operates a retail department store in Anderson, Indiana. The property was assessed at $4,513,400 for 2019, $4,517,000 for 2020, and $4,517,000 for 2021. Believing these values to be too high, Kohl's appealed to the Madison County Property Tax Board of Appeals, which upheld the 2019 and 2020 assessments but did not act on the 2021 assessment challenge. Kohl's then appealed all three assessments to the Indiana Board of Tax Review.

The Indiana Board held a five-day hearing, at which both parties presented expert appraisals and testimony from the appraisers who prepared them. Both appraisals estimated the value of the property under each of the three standard valuation approaches—the sales comparison approach, the income approach, and the cost approach—before combining these estimates to reach a single reconciled value for

each year.[1] The Kohl's appraisal gave the sales comparison approach the most weight and valued the property at $2,360,000 for 2020, and $2,380,000 for 2021. The Assessor's appraisal assigned equal weight to all three approaches and valued the property at $4,800,000 for 2020, and $4,900,000 for 2021.[2]

In its two final determinations, the Indiana Board thoroughly scrutinized the appraisals presented by each party, finding a litany of flaws in both.[3] (*See generally* Cert. Admin. R. at 949–50 ¶ 1, 985–97 ¶¶ 81–115.) The Court's decision here focuses on the Board's critique of the Kohl's appraisal as only its analysis is necessary to resolve the issues presented in this case because the Board determined that it was more persuasive than the Assessor's appraisal.

---

[1] The three standard approaches are generally accepted appraisal techniques for valuing real property. The sales comparison approach "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." 2021 REAL PROPERTY ASSESSMENT MANUAL ("2021 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2020)) at 2; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2. The income approach examines "income producing properties that are typically rented [and] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." 2021 Manual at 2; 2011 Manual at 2. The cost approach "estimates the value of [any] land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." 2021 Manual at 2; 2011 Manual at 2.

[2] Although the tax years on appeal are 2019, 2020, and 2021, the appraisals only estimate values for 2020 and 2021. The parties stipulated below to value the property for the 2019 tax year at 98% of the 2020 tax year value. (*See* Cert. Admin. R. at 950 ¶ 3 & n.3.)

[3] The Board issued two final determinations in this case. In the first final determination, the Board laid out the evidence presented, analyzed both appraisals in detail, concluded that the Kohl's appraisal was more persuasive than the Assessor's appraisal, and reduced the assessment to match the Kohl's appraisal. After briefing and oral argument, this Court remanded the case to the Board after finding that the Board had failed to explain the reasons that the evidence supported its ultimate findings. *See Madison Cnty. Assessor v. Kohl's Indiana, LP*, 247 N.E.3d 845 (Ind. Tax Ct. 2024). The Board then issued a supplemental final determination filed with the Court on February 4, 2025 (*see* Feb. 6, 2025 Order) and explicitly incorporated the first determination "including all factual findings, conclusions of law, and ultimate conclusions of value." (Feb. 4, 2025 Notice of the Indiana Board Order on Remand and Final Determination at 9 ¶ 27 [hereinafter cited as "Final Det. II"].) The Court therefore considers both determinations together in this opinion.

3

Surveying the Kohl's appraisal, the Board concluded that none of the three valuation approaches (sales comparison, income, or cost) in the Kohl's appraisal "produce[d] particularly strong value conclusions." (Cert. Admin. R. at 987 ¶ 86.) According to the Board, the "sales comparison and income approaches suffer[ed] from a lack of good comparable sales and leases and poorly supported decisions regarding adjustments," while the cost approach was "an even less reliable indicator of value" because it was "too reliant on the other two approaches." (Cert. Admin. R. at 987 ¶ 86.)

In examining the Kohl's sales comparison approach, the Board identified flaws in each of the eight comparable sales used to derive a valuation. It concluded that the analysis was "minimally probative" of the property's value because these sales were "not particularly comparable" to the subject property and that the attempts to adjust the prices of the comparable sales to account for those differences were "poorly supported." (Cert. Admin. R. at 987 ¶ 86; *see also* Cert. Admin. R. at 989 ¶ 92.) The Board found that two of the sales (Sales 1 and 6) "detract[ed] from the reliability of [the] analysis" because the properties sold were "not big box stores," like the Kohl's property, and therefore competed in a different part of the market. (Cert. Admin. R. at 987 ¶ 87.) It "reach[ed] the same conclusion about the majority of [the] remaining sales" because the sale properties had a different post-sale use than the Kohl's property. (Cert. Admin. R. at 987–88 ¶ 88.) Specifically, the Board noted that two properties were "put to no use" after being sold (Sales 2 and 6), two were used as multi-tenant properties (Sales 4 and 8), and one was used for self-storage (Sale 5). (Cert. Admin. R. at 987–88 ¶ 88.) The Board emphasized that the "generic description" in the appraisal that these sales were "being used for retail purposes both before and after sale" did "little to establish" that

4

they were competing in the same market as the subject property. (Cert. Admin. R. at 987–88 ¶ 88.) It also found that three of those sales, along with one additional sale (Sale 7), "sold with deed restrictions that limited some of the properties' potential future retail uses for periods ranging from 4 to 50 years." (Cert. Admin. R. at 988 ¶ 89.) Kohl's attempted to equate the deed-restricted sales to the Kohl's property by making a blanket 5% adjustment to the sale prices to account for those deed restrictions, but the Board found the adjustment "inappropriate" because the deed restrictions "var[ied] significantly in both length and limitations." (Cert. Admin. R. at 988 ¶ 89.) It found that the deed restriction on Sale 7, in particular, "further reduce[d] the reliability" of the Kohl's analysis because it "rule[d] out any future use of the property as a big box discount store like the subject [property] until 2041." (Cert. Admin. R. at 988 ¶ 89.) Additionally, the Board found that another sale (Sale 3) "provide[d] very little support" for the Kohl's sales comparison value estimate because the sale included a significant amount of surplus land and Kohl's did not account for the impact of the buyer's post-sale expenditures on the sale property. (Cert. Admin. R. at 988–89 ¶ 90.) Finally, the Board found that the two independent studies offered by Kohl's to support its overall sale price range were "not reliable indicators of the proper price range for the big box market" because they contained a "broad mix of properties" outside of the size range for big box stores and looked at sales "as far back as 2010." (Cert. Admin. R. 989 ¶ 91; *see also* Cert. Admin. R. 960–61 ¶ 21.)

Turning next to the Kohl's income approach, the Board noted that it had "several deficiencies compared to the sales comparison approach" and, like the sales comparison approach, offered only minimal probative value. (Cert. Admin. R. at 990

5

¶ 96; *see* Cert. Admin. R. at 992 ¶ 101.) The Board found that the Kohl's income analysis had "several problems that reduce[d] its credibility," including "issues with [the] choice of comparable leases and [the] decisions regarding adjustments." (Cert. Admin. R. at 989 ¶ 93.) The Board began by "seriously question[ing]" the inclusion of a real estate listing to determine the market rent for the subject property, finding that a listing is "just a listing" and, in any event, is not "a good indicator of market rent" in this case because it does not meet Kohl's' definition of a big box store. (Cert. Admin. R. at 990 ¶ 94.) The Board then focused on the four other lease comparables, which it found did "not make for a particularly compelling market rental rate conclusion." (Cert. Admin. R. at 990 ¶ 94.) The Board noted several concerns, including that (1) "all but one of the buildings was older than the subject property and only one [was] from Indiana," (2) one lease was from "one of the most affluent suburbs near Detroit," (3) another lease was "located along one of the busiest roads in Michigan," and (4) another lease was "use[d] as an entertainment center." (Cert. Admin. R. at 989–90 ¶ 94.) The Board also took issue with the adjustments made by the appraiser to equate these comparable leases to the subject property. It found that the "lack of detail" regarding the various adjustments "further diminishe[d] the reliability of [the Kohl's] income capitalization approach" and specifically noted two deficiencies: (1) that Kohl's "failed to adequately explain the reasoning behind [its] adjustments for conditions of lease, size, arterial attributes, demographic attributes, retail submarket attributes, and age/condition," and (2) that Kohl's "offered no details about the market data" it used to adjust for "differences in those characteristics." (Cert. Admin. R. at 990 ¶ 95.)

The Board then examined the Kohl's cost approach, concluding that it "produced

6

the least probative valuation of any of the three approaches" used in the Kohl's appraisal. (Cert. Admin. R. at 992 ¶ 101.) The Board focused primarily on the adjustments for significant functional and external obsolescence—changes made to account for (a) "loss in value due to the layout, design, or other characteristics within the boundaries of the property," and (b) "loss in value due to factors outside the property's boundaries." (Cert. Admin. R. at 991 ¶ 99.) The Board found the reasons for those adjustments "too generalized to support the significant amounts of obsolescence." (Cert. Admin. R. at 991 ¶ 99.) It also concluded that the Kohl's cost analysis could not serve as "an independent indicator of value" because "the methods [Kohl's] used to quantify obsolescence rely on data from [the] other two valuation approaches." (Cert. Admin. R. at 991 ¶ 100.) As the Kohl's "sales and income approaches did not produce particularly strong valuations, [the Board found] that their use in quantifying obsolescence prevented [Kohl's] from determining a reliable adjustment." (Cert. Admin. R. at 991–92 ¶ 101.)

Having found significant flaws with both parties' expert appraisals, the Board concluded that neither party's cost approach analysis "produced persuasive valuations" and found the cost approach to be "the least applicable valuation approach for this assignment" because of "the age of the subject property." (Cert. Admin. R. at 997 ¶ 116.) It found that both parties' sales and income approaches "had similar issues related to the selection of comparable sales and leases and their adjustment choices." (Cert. Admin. R. at 997 ¶ 116.) Nevertheless, the Board found that the sales comparison analyses were the "most persuasive evidence supporting the appraisers' reconciled values" and that the Kohl's sales comparison approach "establish[ed] a

7

reliable and credible foundation for [the appraisal's] reconciled conclusions of value." (Final Det. II at 13 ¶¶ 40–41.)

The Board ultimately concluded that the Kohl's appraisal was "the most persuasive valuation evidence" presented by the parties. (Cert. Admin. R. at 997 ¶ 116.) It reached the conclusion "through a negative finding of fact" that the Assessor's appraisal was "*less credible*." (Final Det. II at 12 ¶ 39 (emphasis in original).) The Board explained that this conclusion "hinges on the relative weaknesses" of the parties' sales comparison approaches and the Board's finding that the flaws in the Kohl's analysis are "somewhat less egregious than those [in the Assessor's analysis]." (Final Det. II at 13 ¶ 41, 14 ¶ 45.) According to the Board, the Assessor's "decision to simply rely on a preselected set of comparable sales and leases and his reliance on allocated sales prices from a portfolio sale in his sales comparison approach ultimately tip the scales in Kohl's favor, if only slightly." (Cert. Admin. R. at 997 ¶ 116.) The Board noted that portfolio sales are less credible than single-property sales because the allocation of prices within a portfolio sale "are not the result of market forces specific to each property" and "may be based on negotiations and considerations unrelated to market value." (Final Det. II at 13 ¶ 44.)

Based on its determination that the Kohl's appraisal was the more persuasive of the two expert appraisals, the Board then concluded that the assessment should be reduced to reflect the values in that appraisal. (Final Det. II at 1 ¶ 1; Cert. Admin. R. at 997–98 ¶¶ 116–17.)  The Board explained that the Kohl's appraisal is sufficient to disprove the assessment because it (1) was prepared by an expert appraiser and (2) is a "USPAP-compliant appraisal issued in conformity with generally accepted appraisal

8

practices."[4] (Final Det. II at 10 ¶ 30; *see* Final Det. II at 5 ¶ 10.) The Board concluded that "[t]his, standing alone, is sufficient to establish a prima facie case for the market value-in-use of the subject property." (Final Det. II at 10 ¶ 30.) While the Board also found that the Assessor's appraisal met this same standard, the Board determined that the Kohl's appraisal was the more persuasive of the two and thus prevailed, noting that "a weak expert opinion is still sufficient to rebut an assessment and establish a new value, in the absence of a more persuasive opinion." (Cert. Admin. R. at 12 ¶ 36; *see also* Cert. Admin. R. at 12 ¶ 37, 12 ¶ 39.)

## STANDARD OF REVIEW

This Court's review of Indiana Board decisions is governed by Indiana Code § 33-26-6-6, which closely mirrors the language governing judicial review of administrative decisions from Indiana's Administrative Orders and Procedures Act. *Compare* IND. CODE § 33-26-6-6(e) (2025), *with* IND. CODE § 4-21.5-5-14(d) (2025). Under Indiana Code § 33-26-6-6, the party seeking to overturn a final determination of the Board bears the burden of demonstrating its invalidity. IND. CODE § 33-26-6-6(b). Challengers must demonstrate that they have been prejudiced by a final determination

---

[4] According to the Appraisal Foundation:

> The Uniform Standards of Professional Appraisal Practice (USPAP) [are] the generally recognized ethical and performance standards for the appraisal profession in the United States.
> . . . .
> USPAP was . . . authorized by Congress in 1989. It contains standards for appraisal disciplines, including real estate, personal property, business valuation, and mass appraisal. Compliance with USPAP is required for state-licensed and state-certified appraisers who perform appraisals for federally-related real estate transactions.

*USPAP*, THE APPRAISAL FOUNDATION (trademark symbols omitted) (last visited August 21, 2025), https://www.appraisalfoundation.org/pages/uspap.

9

of the Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. IND. CODE § 33-26-6-6(e). The Board's legal conclusions are reviewed *de novo* and its factual determinations are afforded deference when they are supported by substantial and reliable evidence. *Majestic Props., LLC v. Tippecanoe Cnty. Assessor*, 241 N.E.3d 642, 644 (Ind. Tax Ct. 2024) (*citing Indiana Alcohol & Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 375 (Ind. 2017)).

**DISCUSSION**

The Assessor contends that the Board abused its discretion by adjusting the assessment to match the taxpayer's appraisal valuation. He does not take issue with the Board's determination that the taxpayer's appraisal was more persuasive than his. Nor does he dispute that the flaws in the taxpayer's appraisal were "somewhat less egregious" than the flaws in the appraisal he presented. Instead, he challenges the Board's conclusion that the taxpayer's appraisal satisfied the burden of proof by simply being prepared by an expert appraiser and complying with USPAP and generally accepted appraisal principles. (*See* Pet'r's Suppl. Br. at 5.) He acknowledges that an expert "appraisal *may be* enough evidence to meet the burden of proof" but he insists that an expert "appraisal is not *per se* evidence" that an assessment is incorrect. (Pet'r's Suppl. Br. at 4–5 (emphasis in original).) He maintains that the taxpayer must still "establish how and why the facts and evidence presented [in its appraisal] are probative of this particular property's value" and that the Board must weigh an appraisal like any

10

other probative evidence. (Pet'r's Suppl. Br. at 5.) He asserts that the "glaring issues" the Board identified with the taxpayer's appraisal preclude the Board's determination that the assessment is incorrect and that the assessment should be reduced to match the valuation of the taxpayer's appraisal. (Pet'r's Suppl. Br. at 6; *see* Pet'r's Br. at 24–25.) He would have this Court reverse the Board and find that neither party's evidence was sufficient to meet the burden of proof, leaving the original assessment in place.

In response, Kohl's asserts that "[t]he Board's analysis tracks precisely this Court's definition and approach to establishing a prima facie case" sufficient to satisfy the burden of proof. (Resp't's Suppl. Br. at 3.) Kohl's argues that an expert appraisal that is consistent with the requirements of Indiana law "will be sufficient to make a prima facie case unless the Board finds the appraisal to be unreliable." (Resp't's Suppl. Br. at 5.) Noting that expert appraisals are the "gold standard" for proving an assessment incorrect and that an expert appraisal has rarely fallen short of meeting the burden, Kohl's contends the Board was correct to confine its analysis to determining which of the two expert appraisals was more persuasive and to adopt the valuations from the Kohl's appraisal. (Resp't's Suppl. Br. at 7–8.) Kohl's asserts that reversing the Board's determination would improperly require this Court to reweigh the evidence and transform the preponderance standard into "a standard of perfection." (Resp't's Br. at 1–2; Resp't's Suppl. Br. at 7–8.)

The dispute in this case poses two interrelated questions for the Court to examine. The first is whether a USPAP-compliant appraisal prepared by an expert appraiser in accordance with generally accepted appraisal principles can satisfy the taxpayer's burden of proof regardless of its content. The second question, which arises

11

only if the first is answered in the negative, is whether the Kohl's appraisal can satisfy the burden of proof despite the extensive and systemic flaws identified by the Board. The Court answers the first question in the negative, holding that the Board misapplied the law, but stops short of answering the second question. While the Board's findings appear likely to preclude the taxpayer's appraisal from satisfying the burden of proof, such a question should be examined by the Board before this Court intervenes.

**An Expert Appraisal Does Not Automatically Satisfy the Burden of Proof**

The burden of proof in property tax valuation appeals has long been established: the taxpayer must demonstrate that an assessment does not accurately reflect a property's true tax value (i.e., its market value-in-use). *See* 50 IND. ADMIN. CODE 2.4-1-1(c) (2008) (amended in 2020). If the taxpayer fails to make its burden, the assessment remains in effect as it is presumed to be correct. *Id*.; *see also Lake County Assessor v. O'Day Holdings*, 249 N.E.3d 677, 684–85 (Ind. Tax Ct. 2024). The taxpayer may use "[a]ny evidence relevant to the true tax value of the property as of the assessment date" to disprove the assessment. 50 IND. ADMIN. CODE 2.4-1-1(c). This evidence can include an appraisal, but one is not required. *See id.* Ultimately, the determination of whether an assessment has been disproven turns on the Board's evaluation of "all relevant evidence presented." *Id.* A taxpayer who fails to meet their burden to disprove the assessment cannot prevail and is not entitled to have their assessment changed.

Once both parties have had an opportunity to present evidence, the Board's role is to determine whether the evidence establishes that the assessment is incorrect and, if so, what the assessment should be. *See O'Day*, 249 N.E.3d at 685, 688. By statute,

these determinations must be made by "a preponderance of the evidence," IND. CODE § 6-1.1-15-4(j), which requires the Board to find that a given fact is "more likely true than not." *Geels v. Flottemesch*, 243 N.E.3d 1069, 1071 (Ind. 2024) (per curiam). In valuation cases, this requires the Board to determine (1) if the assessment is "more likely than not" incorrect and (2) what alternative value is "more likely than not" the true tax value of the property. When the Board concludes to a specific value, as it did here, it must demonstrate that the concluded value is more likely than not the true tax value of the subject property. This is a different inquiry than the one the Board performed here.

In this case, the Board did not perform the preponderance analysis. Instead, the Board only determined that the Kohl's appraisal valuation was more likely to reflect the value of the subject property *than the Assessor's appraisal valuation*. (*See* Final Det. II at 14 ¶ 45.) The Board never determined that the Kohl's appraisal, standing alone and independent of the Assessor's competing appraisal, more likely than not reflected the value of the property. (*See* Final Det. II at 14 ¶ 45.)

This is because the Board assumed that a USPAP-compliant appraisal prepared by an expert appraiser is sufficient to prove an assessment incorrect without further inquiry. According to the Board, a taxpayer need only present "(1) market evidence and (2) a showing that the valuation comports with generally accepted appraisal principles." (Final Det. II at 6 ¶ 14; *see also* Final Det. II at 5–6 ¶ 13.) These requirements, the Board concludes, are satisfied by "[a]n appraisal from a qualified appraiser" that is USPAP-compliant unless the appraisal is "shown to be inconsistent with the evidence or the requirements of the law." (Final Det. II at 7 ¶ 18 (internal quotations omitted).) Therefore, by applying this two-prong test, the Board concluded that the assessment is

incorrect because both parties presented USPAP-compliant appraisals prepared by expert appraisers. (Final Det. II at 10 ¶ 30, 12 ¶ 37.) Nothing more is required under the Board's formulation.

The Board misses the mark: its use of a *prima facie* analysis to evaluate the burden of proof assumes that the form of an appraisal can outweigh its substance. The Board is correct that market evidence and conformance to generally accepted appraisal principles are necessary elements to satisfy the burden of proving an assessment incorrect. *See Piotrowski v. Shelby Cnty. Assessor*, 177 N.E.3d 127, 130–31 (Ind. Tax Ct. 2021); *Grabbe v. Carroll Cnty. Assessor*, 1 N.E.3d 226, 231 (Ind. Tax Ct. 2013). But this Court has never held that these two elements are sufficient on their own to satisfy the burden of proof. No case, statute, or regulation supports the notion that a USPAP-compliant appraisal prepared by an expert appraiser in compliance with generally accepted appraisal principles is automatically sufficient to overturn an assessment, even in the face of flawed data, analysis, or conclusions. This Court expressly rejected such a *per-se* rule in *Wigwam Holdings LLC v. Madison Cty. Assessor* after reviewing several cases from this Court. 125 N.E.3d 7, 11–12 (Ind. Tax Ct. 2019); *Grant Cnty. Assessor v. Ballinger*, 157 N.E.3d 34, 41 (Ind. Tax Ct. 2020). As the Court emphasized in *Wigwam*, the evaluation of an appraisal is no different than any other evidence: the Board, as the finder of fact, must assess the evidence and "determin[e] how much weight, if any, should be afforded to [it]." *Wigwam*, 125 N.E.3d at 12. The Board's two-prong test results in the improper establishment of a *per-se* rule and is thus overly narrow. Such a rule is insufficient to support an inference that an assessment is incorrect and thus incapable of establishing a *prima facie* case.

14

Appraisals, like books, cannot be judged by their covers. For an appraisal to meet the burden of proof, its analysis and conclusions of value must stand on their own. They must convince the finder of fact to the level of a preponderance. Assertions that an appraisal is prepared by an expert appraiser in accordance with generally accepted appraisal principles may yield some credibility and demand some weight, but such conclusory statements are not enough. The Board must actually take account of its own evaluation of the data, analysis, and reasoning employed in the appraisal to determine if the burden of proof has been met. Were it otherwise, the Board's two-prong test would turn the evaluation of an expert appraisal into a formulaic, check-the-box exercise that automatically accorded persuasive weight to such appraisals, regardless of the soundness of the analysis, the quality of the data, or the accuracy of the conclusions. This framework would improperly allow a mere scintilla of evidence to carry the day.

Because the Board applied the wrong legal standard, the Court finds that the Board abused its discretion. An abuse of discretion occurs when the Board issues a finding that is "against the logic and effect of the facts and circumstances before it or in contravention of the law." *DuSablon v. Kaufman*, 160 N.E.3d 587, 591 (Ind. Tax Ct. 2020). Here, the Board acted contrary to law by applying a *per-se* rule that automatically accords persuasive weight to USPAP-compliant appraisals prepared by expert appraisers. Such a rule improperly elevates form and pedigree over quality and content. The Board needed to assess the persuasive value of the Kohl's appraisal separate from the Assessor's appraisal and in conjunction with the Board's own evaluation of the appraisal's data, analysis, and conclusions.

**The Board's Misapplication of the Law was Not Harmless Error**

Having determined that the Board erred in improperly applying a *per-se* rule to its evaluation of persuasiveness, the Court must now determine whether the Board's error merits reversal. By statute, only those errors that are prejudicial should be overturned, which has traditionally been understood as a question of harmless error in reviewing administrative decisions. *See* IND. CODE § 33-26-6-6(e); *Ciceu v. Knox Cnty. Assessor*, 232 N.E.3d 662, 666–667 (Ind. Tax Ct. 2024). An error is generally considered harmless when it would not affect the outcome of the case. *Ciceu*, 232 N.E.3d at 667. When a Court determines that an error may impact the outcome, remand is the appropriate action for an appellate court. *See, e.g., Buhring v. Tavoletti*, 905 N.E.2d 1059, 1068 (Ind. Ct. App. 2009) (reversing and remanding for a new trial, because misleading or incorrect statements of law had a significant likelihood of impacting the outcome of the case).

Because the Board rested its decision entirely on the application of the *per-se* rule addressed in the first part of this opinion, it never determined whether the Kohl's appraisal met the preponderance standard in the absence of that rule.[5] The Court must

---

[5] On rehearing, Kohl's argues that the Board rested its decision on more than the straightforward application of the *per-se* rule. Kohl's points to statements by the Board that the Kohl's appraisal did not lack any probative value and "offered a credible opinion based to a large degree on [its] sales comparison approach." (Pet. for Reh'g at 5 (citing Final Det. II at 10 ¶ 31, 12 ¶ 36); *see also* Reh'g Trans. 6:14–9:7, 21:9–24:2.) However, two aspects of the surrounding context for those statements make apparent that the Board did not undertake an analysis aside from its *per-se* rule analysis. First, the statements Kohl's identifies are made in the section of the second Final Determination entitled "[The Kohl's] Appraisal Established a Prima Facie Case," which is dedicated to explaining why the Kohl's appraisal satisfied the Board's two-prong, *per-se* rule for establishing a *prima facie* case. (*See generally* Final Det. II at 10–12 ¶¶ 28–37.) Second, the statements are conclusory assertions that reject the Assessor's criticisms of the Kohl's appraisal but do not square those conclusions with the Board's own findings of flaws and shortcomings in the appraisal. (*See* Final Det. II at 10 ¶ 31, 12 ¶ 36). Such assertions without reconciling otherwise conflicting findings confirm that the Board was only performing a *per-se* analysis.

therefore predict whether the Board's other findings are likely to lead to a different conclusion under the harmless error analysis. *See Butler v. Kijakazi*, 4 F.4th 498, 504–05 (7th Cir. 2021) (finding error is harmless when the Court "can predict with great confidence" that the same result will be reached on remand). The Board is definitive in its supplemental determination that the only basis for its ultimate conclusion—that the subject property's assessment should be reduced to reflect the taxpayer's appraisal—is its application of the *per-se* rule and its finding that the Assessor's appraisal was less credible than the Kohl's appraisal. That *per-se* rule obviated the need for the Board to consider the persuasiveness of the *content* of the Kohl's appraisal relative to the preponderance standard. As such, the Board never reached the question of whether the Kohl's appraisal could satisfy the burden of proof when the extensive flaws identified by the Board are taken into account.[6]

In considering the effect of the error here, the Court is mindful that appraisals embody human judgment and therefore are inherently imperfect attempts to quantify the unknown. Perfection is not the standard for appraisals. "[P]roperty valuation is more art than science and the evidence does not always permit . . . exactitude." *O'Day*, 249 N.E.3d at 688. And, as the Board aptly points out, "[f]laws in appraisals are sometimes the result of an appraiser's mistakes or lack of thoroughness" or are due to

---

[6] In fact, the Board found that it could not reach this question in its supplemental final determination. The Court's first decision in this case instructed the Board to "identify the evidence that supported its conclusion[s] about the Kohl's appraisal and explain how that evidence led the Board to its conclusion[s]." *Madison Cnty. Assessor v. Kohl's Indiana, LP*, 247 N.E.3d 845, 851 (Ind. Tax Ct. 2024). The Board interpreted that decision as instructing it to "(1) not reweigh the evidence and (2) confine [its] additional findings, as much as practicable, to the evidence in favor of the Taxpayer." (Final Det. II at 4 ¶ 7.) The Board also found that it was "preclude[d] . . . from reconsidering [its] ultimate findings or granting any relief to the Assessor." (Final Det. II at 4 n.3.)

17

circumstances "beyond the appraiser's control." (Final Det. II at 11 ¶ 33.) While it is well-established that the Board may rely on flawed appraisals, some flaws can render an assessment erroneous beyond rehabilitation.

Based solely on the Board's detailed findings about the Kohl's appraisal, it appears that the Board's ultimate conclusion to reduce the assessment to match the appraisal has little support in the Board's findings. The Board systematically reviewed the Kohl's appraisal and found extensive flaws with its data, analysis, and conclusions. At no point in its review does the Board discuss any countervailing aspects of the appraisal's analysis that it believes ameliorate or otherwise overcome those significant flaws. The only positive attributes that the Board highlights are those discussed in the first part of this opinion: that the appraisal is USPAP-compliant and that it was prepared by an expert appraiser. As noted in the first part of this opinion, such attributes, standing alone, are not enough to satisfy the burden of proof.

It is important to note that the potential for error flowing from the Board's ultimate conclusion does not stem from the number of flaws the Board identifies, but rather from the nature of those flaws. The overwhelming majority undermine the very foundations of the Kohl's appraisal itself, as reflected by the Board's finding that none of the three approaches "produce[d] particularly strong value conclusions." (Cert. Admin. R. at 987 ¶ 86.) Indeed, the Board found that all three valuation approaches used in the appraisal are, at best, "minimally probative."[7] (Cert. Admin. R. at 989 ¶ 92; *see also* Cert. Admin.

---

[7] The term "minimally probative" is not an established term of art possessing a fixed meaning. The ordinary meaning of the words "minimally" and "probative" suggest that the Board's use of the term may have been intended to convey that the three valuation approaches used in the Kohl's appraisal possess an extremely minute tendency to prove the value of the Kohl's property. *See Minimal*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1438 (2002 ed.) (defining "minimal" as "constituting the least possible in size, number, or degree" or "extremely minute");

R. at 991 ¶ 101.)

Taking each approach in turn, the Board identified what appear, based on the Board's own findings, to be fundamental flaws with each of the three valuation approaches used in the taxpayer's appraisal. First, in its evaluation of the sales comparison approach, the Board found that every single one of the eight comparable sales used in the analysis was only "marginally similar" to the Kohl's property and expressed significant skepticism about the adjustments made to the sales to account for the differences. (*See* Cert. Admin. R. at 987–89 ¶¶ 87–92.) Yet, comparable sales are the heart of the sales comparison analysis. The analysis specifically estimates the value of a property "by comparing it to *similar, or comparable*, properties that have sold in the market." 2021 Manual at 2 (emphasis added); 2011 Manual at 2 (emphasis added); *see also* THE APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 377 (14th ed. 2013) (explaining that the sales comparison approach derives the value of a "subject property by comparing *similar properties* that have recently sold with the property being appraised") (emphasis added). Moreover, the lack of similar uses potentially implicates the market value-in-use standard that defines Indiana's assessment system. Under that standard, property value depends on the "current use" of the property, not only on what price it can fetch in the open market. 2021 Manual at 2; 2011 Manual at 2; *see Eckerling*

_Probative_, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "probative" as "[t]ending to prove or disprove"). Under that definition, the Board could be understood as having found that the evidence amounted to as little as a scintilla and was therefore incapable of supporting a reasonable inference of the value of the Kohl's property. *See Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 990 (Ind. 1977) ("A scintilla is by definition barely perceptible and would not support a reasonable inference."). However, because the Board does not explain what it means by its use of the term "minimally probative," it is possible that the Board intended some other meaning and intended to ascribe a different probative weight to the evidence. On remand and in future cases, the Board should explain what it means by the term "minimally probative" should it continue to employ the term.

*v. Wayne Twp. Assessor*, 841 N.E.2d 674, 675 (Ind. Tax Ct. 2006). Second, in its evaluation of the taxpayer's income approach, the Board expressed a similar view to its assessment of the sales comparison analysis, finding that none of the five comparable leases offered to support the income analysis "ma[de] for a particularly compelling market rental rate conclusion" because of their significant differences and unsupported adjustments. (Cert. Admin. R. at 990 ¶ 94.) Like the sales comparison analysis, these flaws go to the very core of the Kohl's income analysis. That analysis directly relied on comparable leases to determine an estimated market rent, which it then used as the basis of its valuation estimate after several calculations and adjustments. (*See* Cert. Admin. R. at 961–65 ¶¶ 24–33.) Third, and finally, the Board rejected the Kohl's cost approach altogether, concluding that neither party's cost approach "produced [a] persuasive valuation[]." (Cert. Admin. R. at 997 ¶ 116.)

The totality of the Board's findings appear to indicate that, in the absence of the persuasive value accorded by the Board's *per-se* rule, the Kohl's appraisal is unlikely to satisfy the burden of persuasion in this case, thus making the Board's error prejudicial. The Board's critical analysis of the Kohl's appraisal suggests that the Assessor's claim—that the "glaring issues" with the appraisal likely prevent a finding in favor of adopting the Kohl's valuation—may be well founded and that the Kohl's appraisal requires reexamination using the proper legal framework. Even so, such extensively and fundamentally flawed appraisals are generally the exception and not the rule. Expert appraisals remain an important tool for valuing property under Indiana's market value-in-use system. The lesson here is that an expert appraisal is only as good as its data, its analysis, and its power to convince.

## CONCLUSION

The Court REVERSES the Indiana Board's final determinations and REMANDS to the Board for further proceedings consistent with this opinion. The Board is instructed to reexamine the evidence under the burden of proof analysis without regard to the *per-se* rule it articulated in its second final determination.